## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES**<br><br>**v.**<br><br>**JEAN PELICE** | **Criminal Action No. 22-246 (JDB)** |

## <u>MEMORANDUM OPINION</u>

Pelice is charged with hostage taking, conspiracy, and aiding and abetting in violation of 18 U.S.C. §§ 1203(a) and 2.  <u>See</u> Indictment, Dkt. 11.  He now moves to suppress statements that he made to law enforcement on the basis that they were not voluntary and were given without having been properly advised of his rights as required by <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). Because the government has carried its burden to show by a preponderance of the evidence that Pelice's statements were voluntary and that Pelice received <u>Miranda</u> warnings and waived his rights before his custodial interrogation, the Court denies Pelice's motion to suppress.

## <u>Background</u>

According to the indictment, Pelice was a senior leader of 400 Mawozo, a Haitian gang that operated in a suburb near Port-au-Prince, Haiti.  Indictment ¶¶ 1, 6-9.  From January 2020, 400 Mawozo was engaged in armed kidnappings of U.S. citizens in Haiti for ransom, including a conspiracy from October 2021 to December 2021 to kidnap and ransom sixteen U.S. citizen Christian missionaries.  <u>Id.</u> ¶¶ 4-5.  Five of the sixteen U.S. missionary hostages were released and the others eventually escaped after 62 days in captivity.  <u>Id.</u> ¶ 13.  The indictment alleges that Pelice managed the hostages' guards at times, inspected a sick hostage's condition, and engaged in various communications with other gang leaders about the hostages.  <u>Id.</u> ¶ 17(f), (j), (s), (z).

Pelice claims that he was not in Haiti or participating in the activities of 400 Mawozo during the time of the alleged kidnappings because he was hospitalized after being struck in the head with a machete.  Def.'s Mot. to Suppress (Mot.) 2, Dkt. 48.  The government disputes this, pointing out that the indictment charges that Pelice was in Haiti and participating in 400 Mawozo activities, including the hostage taking, during the relevant period.  Gov't Opp'n to Mot. (Opp'n) 1 n.1, Dkt. 49.  In any event, Pelice traveled to the Dominican Republic in February 2022, where he made the initial statements at issue.  Mot. 2.

The defense principally argues that Pelice's statements made during an April 28, 2022, interview in Santo Domingo with U.S. law enforcement should be suppressed because they were involuntary and were made during a custodial interrogation without <u>Miranda</u> warnings.  <u>See</u> Mot. The government responds that the interview was voluntary and Pelice was not in custody.  Opp'n 2.  The defense also seeks to suppress statements made subsequent to the April 28 interview as tainted by that interview.  Mot. 3.  For its part, the government argues that U.S. authorities next interviewed Pelice on July 8, 2022, in the United States—following his arrest—and that he received <u>Miranda</u> warnings before that interview and voluntarily waived his rights in the presence of his then-counsel.  Opp'n 2-3.

Accordingly, the Court held a hearing on December 4, 2025, on the voluntariness and <u>Miranda</u> issues.  <u>See</u> <u>Jackson v. Denno</u>, 378 U.S. 368, 376-77 (1964) (recognizing right to voluntariness hearing); <u>United States v. Neely</u>, 124 F.4th 937, 951 (D.C. Cir. 2024) (explaining right to <u>Miranda</u> hearing unless defendant's assertions are insufficient to establish a constitutional violation or there are no disputes of material fact).

At the motion hearing, FBI Special Agent John Dugue testified for the government. According to Dugue, U.S. law enforcement first became aware of Pelice in March 2022, when he

posted videos on YouTube in which he discussed his 400 Mawozo activities—including the missionary kidnapping at issue in this case—and stated that he wanted to talk to U.S. authorities. Rough Draft Hr'g Tr. 11:22-13:5 (Hr'g Tr.). Indeed, Pelice provided a phone number and answered when Dugue called. Id. at 13:5-9. Specifically, on March 3 and 4, 2022, Dugue and Diplomatic Security Service Special Agent Zachary Harrison spoke to Pelice via WhatsApp, with Dugue providing Haitian Creole translation for Harrison. Id. at 13:10-14:7. Dugue testified that neither he nor Harrison made any promises or threats to Pelice or told him that he would be arrested. Id. at 14:8-16. However, they did ask Pelice if what he had said on YouTube was true, and the agents and Pelice agreed that Dugue and Harrison would travel to the Dominican Republic to meet Pelice in person. Id. at 14:17-24, 30:2-18.

U.S. law enforcement first met in person with Pelice in the Dominican Republic near the border with Haiti. Id. at 32:18-24. Dominican Republic Departamento Nacional De Investigación (DNI) agents were also present, dressed in business casual, and Pelice was accompanied by his two wives and children. Id. at 33:3-22. The parties arranged to meet again but no interview was conducted at the initial encounter. Id. at 32:25, 33:24-34:5.

The next meeting took place on April 28, 2022, and is the main focus of Pelice's motion. Id. at 6:7-8. Pelice met with U.S. authorities for an interview in a conference room in Santo Domingo at the DNI, which is a two-story government office building where the Dominican Republic's intelligence functions are located. Id. at 15:9-13. It is not clear how Pelice arrived at the meeting, but he was staying in a nearby hotel. Id. at 32:4-10, 34:14-23. Eight people were present for the interview: Pelice, one of his wives, three U.S. law enforcement agents (Dugue, Harrison, and FBI Special Agent Alexandra Montilla), and three members of DNI (Colonel Pedro Castro, Head of Haitian Affairs, and two DNI analysts). Id. at 15:14-16:7. All six law enforcement

personnel were dressed in business casual, the U.S. law enforcement agents were unarmed, and to Dugue's knowledge so were the DNI agents. Id. at 15:18-21, 16:8-12. The conference room had one door that required keycard access to enter but not to leave, padded office chairs for up to 10 or 12 people, and large windows. Id. at 16:16-17:4. Police sat opposite the door next to his wife and everyone was seated. Id. at 45:14-21.

During the April 28 interview, Police was not restrained, and Dugue told Police that the interview was voluntary and that he could stop if he wanted, but he never asked to stop or leave. Id. at 17:8-18:3. Nobody told Police whether he would be arrested. Id. at 37:18-38:7. Police was calm and smiling, eager to answer questions, and offered many details about gang activities. Id. at 18:13-18. He also shared that he had a head injury from being hit with a machete. Id. at 34:24-35:10. The interview was in Haitian Creole; Dugue translated into English for Harrison and Montilla, and one of Castro's analysts translated into Spanish for him, but he did not ask any questions. Id. at 18:25-19-10, 38:17-40:2. The tone of the interview was cordial, nobody made promises or threats to Police and he did not request an attorney. Id. at 19:11-25. According to Dugue, Police said that he did not trust the Haitian authorities and wanted to tell his story to U.S. law enforcement, so Dugue told him the best way to do so would be to go through the legal system in the United States. Id. at 20:9-21, 42:19-43:25. Dugue could not recall how long the interview lasted, but it could have been a couple of hours. Id. at 35:11-16. None of the U.S. agents gave Miranda warnings to Police. Id. at 36:20-37:17. The meeting was not recorded, id. at 38:8-16, but U.S. law enforcement summarized the interview in an FD-302 form, id. at 53:9-19. At the end of the meeting, U.S. law enforcement went to retrieve their vehicle and DNI agents escorted Police in the opposite direction. Id. at 41:11-42:4. Thereafter, U.S. authorities arranged for Police to travel to the United States. Id. at 44:7-14.

On or around May 13, 2022, Police traveled along with Dugue and Harrison by commercial plane to the United States, where he was arrested on arrival in Miami by Customs and Border Protection (CBP) officers.  Id. at 21:3-23:13; 45:22-47:19.  On direct examination, Dugue stated that Police was advised of his rights at that point, id. at 23:22-24, but on cross examination Dugue said that he did not read Police any rights and so did not know if Police was read his rights, id. at 47:5-7.  Upon arrest, Police asked to speak to a prosecutor and so a call was placed to Assistant U.S. Attorney (AUSA) Karen Seifert.  Id. at 48:10-18.  Seifert told Police that she could not say much at that time except that he had been arrested in relation to his role in the missionary kidnapping and that he would know more about his situation upon his initial appearance before a judge.  Id. at 49:18-50:1.  Police did not appear shocked to have been arrested.  Id. at 48:19-49:3.  No interview was conducted on the date of arrest, id. at 23:25-24:5, and the government does not intend to introduce into evidence any statements Police made that day, Opp'n 2.  Dugue did not know of any interviews conducted between the date of arrest and July 8, 2022, and there is no record of any FD-302 forms in that time period either.  Hr'g Tr. 47:24-48:3, 54:5-11.

On July 8, U.S. authorities spoke with Police again in an interview room at the Alexandria Detention Center, where he was being held.  Id. at 24:6-17, 50:19-51:7.  Six people were present for that meeting: Dugue, Supervisory Special Agent Liz Santamaria, Seifert, Police, Police's then-attorney Alfred Guillaume III, and an interpreter.  Id. at 24:12-15, 26:11-12.  Before the interview, Police was able to speak with his attorney privately and with his family under Dugue's supervision. Id. at 24:18-25:4.  Dugue testified that either he or Santamaria advised Police of his rights in Haitian Creole, although Dugue could not recall who did.  Id. at 25:5-26:15.  AUSA Seifert also explained the proffer letter to Police and Guillaume, although the record is unclear on whether

Pelice and his counsel signed it.  Id. at 26:17-27:2, 51:21-52:5.[1]  During the interview, Pelice was given several opportunities to speak privately with his attorney.  Id. at 52:6-11.

Pelice did not testify.  Following the suppression hearing, Pelice's motion is now ripe for review.

## Discussion

A defendant's involuntary statement may not be used against him for any purpose in his criminal trial, whereas his voluntary statement made in violation of Miranda may be used only for impeachment purposes.  Mincey v. Arizona, 437 U.S. 385, 397-98 (1978).  The prosecution bears the burden of proving both voluntariness and Miranda waiver by a preponderance of the evidence.  Colorado v. Connelly, 479 U.S. 157, 168 (1986) (citing Lego v. Twomey, 404 U.S. 477, 488 (1972)).

### I.    Voluntariness

A defendant has a due process right not to be convicted based on his involuntary confession—whether true or false—and to have a hearing on the issue of voluntariness before a court admits his confession as evidence.  See Lego, 404 U.S. at 483-87; United States v. Roberson, 573 F. Supp. 3d 209, 217-18 (D.D.C. 2021).  "Voluntariness turns on whether the 'defendant's will was overborne' when he gave his statement, and the test for this is whether the statement was a 'product of an essentially free and unconstrained choice by its maker.'"  United States v. Murdock, 667 F.3d 1302, 1305 (D.C. Cir. 2012) (first quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973); then quoting Culombe v. Connecticut, 367 U.S. 568, 602 (1961)).  In

---

[1] When asked by defense counsel whether "there was a [proffer] letter . . . that Mr. Guillaume and Mr. Pelice signed," Dugue testified that "[t]here was a letter, yes."  Id. at 51:22-25.  As follow up, defense counsel asked whether Pelice and Guillaume "sign[ed] that letter" before or after AUSA Seifert explained its contents to them, and Dugue responded that "AUSA Seifert explained the proffer letter to them and gave them the letter."  Id. at 52:1-5.  The government did not introduce the proffer letter into evidence.  See id. 75:2-76:19.

evaluating voluntariness, courts consider "all the circumstances of the interrogation," id. (quoting Mincey, 437 U.S. at 401), including "the defendant's age and education, the length of detention, whether the defendant was advised of his rights, and the nature of the questioning," id. at 1305-06 (citing Schneckloth, 412 U.S. at 226). To find that a confession was not voluntary, there must be "coercive police activity," Connelly, 479 U.S. at 167, and "egregious facts," United States v. Mohammed, 693 F.3d 192, 198 (D.C. Cir. 2012).

Police argues that his statements in Santo Domingo were not voluntary in part because he was not made aware of his right to remain silent or to have an attorney present. Mot. 4. If Police were interrogated while in custody, such a failure would violate Miranda. Although such a violation is "relevant to whether [Police's] statements were voluntary, . . . it is insufficient by itself to establish involuntariness." Murdock, 667 F.3d at 1306. Police next points out that English is not his primary language and says it is "not clear" whether he "was given the opportunity to secure an independent interpreter." Mot. 4. However, he does not explain why the independence of an interpreter bears on the voluntariness of his statements. After all, a defendant's statements may remain voluntary even when given to police—who are surely not independent—following a Miranda violation. See Murdock, 667 F.3d at 1306. And courts have often found that a defendant speaking English only as a second language does not render statements involuntary, provided that the defendant can understand the questions being asked. See United States v. Avitan, 349 F. Supp. 3d 23, 34-36 (D.D.C. 2018) (collecting cases). Here, the interviews took place in Haitian Creole, so there was no language barrier in any event. Hr'g Tr. 14:2-4, 18:25-19:2, 26:11-14, 38:17-20.

In Murdock, the D.C. Circuit held that a defendant's statements during a custodial interrogation were voluntary where (1) he was an adult with previous prison experience; (2) "he had been given water"; (3) "he agreed during the interview that everything was alright"; (4) "he

showed no apparent mental impairment, understood . . . questions, and gave intelligent answers;" (5) "the interview took place in a standard interrogation room and lasted only a little over an hour"; and law enforcement neither (6) made "false statements about the evidence" nor (7) offered false promises. 667 F.3d at 1307 (citation modified); see also United States v. Hallford, 816 F.3d 850, 858-59 (D.C. Cir. 2016) (holding that defendant's statements were voluntary where he agreed to interview of under an hour; hospital setting was not police-dominated; he was not deprived of essentials; he refused certain law enforcement requests; agents did nothing to indicate he could not leave; and agents were aware of his mental and physical conditions).

The facts here are similar to those in Murdock and Hallford. Regarding the April 28 interview, it is undisputed that Pelice was not read his Miranda rights. Hr'g Tr. 36:20-22. But there is no indication that Pelice was deprived of necessities or that law enforcement made false statements about evidence or false promises. Id. 62:2-4. While longer than the roughly one-hour interviews in Murdock and Hallford, this two-hour interview looks nothing like the week-long detention in Chambers v. Florida, 309 U.S. 227, 235-38 (1940), that the Supreme Court has cited as indicative of involuntariness. See Schneckloth, 412 U.S. at 226. Nor does it resemble the 36-hour continuous interrogation in Ashcraft v. Tennessee, 322 U.S. 143, 153 (1944), that the Court has likewise cited as weighing against voluntariness. See Schneckloth, 412 U.S. at 226. It also appears that Pelice and his wife voluntarily attended the interview and then freely left when it concluded. See Hr'g Tr. 32:4-10, 34:14-23, 41:11-42:4.

The April 28 interview also took place in a large conference room unlocked from the inside within a foreign government building—albeit a law enforcement one—where the U.S. authorities had no jurisdiction. Hr'g Tr. 17:1-4, 56:21-57:5. And when Pelice disclosed his head injury, he did not indicate any mental impairment. Id. at 59:15-25. To be sure, there were six law

enforcement agents in the interview, some necessary for interpretation, but Police's wife was also by his side. Id. at 15:14-16:7. The parties dispute the extent of Police's prior contacts with any criminal justice system, contrast id. at 62:8-13, with id. at 70:20-71:22, but the Court finds that he was not familiar with the U.S. justice system before being arrested, id. at 66:13-15. Finally, the suppression hearing record does not set out Police's age—although he is an adult—or educational attainment, but defense counsel did not argue that these factors weigh against voluntariness. Hr'g Tr. 62:8-20, 70:10-16. Simply put, there is no evidence of the "coercive police activity," Connelly, 479 U.S. at 167, or "egregious facts," Mohammed, 693 F.3d at 198, required to find that the April 28 interview was involuntary.

There is no indication of any interrogation in the United States between the date of Police's arrest and the interview on July 8, 2022. See Hr'g Tr. 54:9-11. And defense counsel conceded at the hearing that it would be hard to argue there was a constitutional violation at the July 8 interview if Police and his then-counsel signed the proffer letter. Id. at 7:9-10. Nevertheless, that is the position that Police takes. Id. at 7:20-21. Following Dugue's uncontradicted testimony that either he or Santamaria provided Police with oral Miranda warnings, defense counsel also concedes that point, but maintains that Police's statements in the July 8 interview were involuntary under the totality of the circumstances. Id. at 67:15-25. On the one hand, the July 8 interview was plainly more custodial than the April 28 one because Police had been arrested in the meantime. On the other hand, he was read his Miranda rights. Most importantly, however, Police was given the opportunity to speak with his then-attorney in private both before and during the interview, and both he and his counsel received a proffer letter that AUSA Seifert explained to them, although the record is not clear on whether they each signed the letter. Hr'g Tr. 24:18-25:4, 26:19-27:2, 51:18-52:11. The Court therefore finds that Police's July 8 statements were also voluntary.

## II.  <u>Miranda</u> Rights

Under <u>Miranda</u>, an individual must be read his rights before a custodial interrogation.  384 U.S. at 478-79; <u>see also</u> <u>Roberson</u>, 573 F. Supp. 3d at 218-19.  Interrogation for <u>Miranda</u> purposes includes both express questioning and "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 (1980).  An individual is in custody where (1) "in light of the objective circumstances of the interrogation" a "reasonable person" would have felt unable to "terminate the interrogation and leave" and (2) "the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in <u>Miranda</u>."  <u>Howes v. Fields</u>, 565 U.S. 499, 509 (2012) (quotations omitted).  As part of step one, courts consider the location and duration of the questioning, statements made during the interview, whether physical restraints were present, and the release of the interviewee at the end of the questioning.  <u>See</u> <u>id.</u>  Under step two, courts consider the shock of arrest and the hope that speaking may lead either to being allowed to leave or to more lenient treatment.  <u>See</u> <u>id.</u> at 511-12.

The Supreme Court has held that an individual who voluntarily comes to the police station where he is informed that he is not under arrest and who in fact leaves without hindrance after a 30 minute interview is not in custody.  <u>See</u> <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977).  It has also held that it is reasonable—but a closer call—to find that an individual is not in custody where he is brought to the police station by legal guardians for a two hour interview, not threatened but not told he is free to leave, offered breaks, and released after the interview.  <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664-65 (2004).

10

Even absent invocation of the right to remain silent, an individual's statement during a custodial interrogation is inadmissible in the government's case-in-chief unless the government can establish that the individual "knowingly and voluntarily waived [his] Miranda rights when making the statement." Berghuis v. Thompkins, 560 U.S. 370, 382 (2010) (quotation omitted). A waiver is voluntary where it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception" and is knowing where it is "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Id. at 382-83 (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). It can be express or "implied from all the circumstances." Id. at 384 (citing North Carolina v. Butler, 441 U.S. 369, 373, 376 (1979)).

Pelice first argues that law enforcement violated his rights under Miranda because the Santo Domingo interview was an unwarned custodial interrogation. Mot. 5. The government disputes only whether Pelice was in custody. Opp'n 5; Hr'g Tr. 36:22-37:13. The facts of the April 28 interview fall in between Mathiason and Yarborough and the Court therefore finds that the interview was non-custodial.

Under Howes step one, the meeting took place in a law enforcement building but not one where U.S. authorities had jurisdiction. Hr'g Tr. 15:9-13. The interview was also conducted in a conference room with large windows that was unlocked from the inside rather than an interrogation room. Id. at 16:16-17:4. The record does not reflect how Pelice arrived at the interview, but he was staying in a nearby hotel. Id. at 32:4-10, 34:14-23. And he was not physically restrained. Id. at 17:8-10. Instead, Dugue told Pelice that he was free to stop the interview, and nobody told Pelice he was or would be under arrest. Id. at 17:11-18:3, 37:18-38:7. At the end of the interview, Pelice and the U.S. agents went their separate ways, although he was still in the presence of DNI agents. Hr'g Tr. 41:11-42:4. Granted, the interview may have lasted two hours, id. at 35:11-16,

which weighs in favor of custody under <u>Yarborough</u>, 541 U.S. at 665. And there were six law enforcement agents in the room. Hr'g Tr. 15:14-16:7. However, Pelice's wife was also at his side. <u>Id.</u> at 17:5-7. Moreover, law enforcement personnel were not uniformed and had no visible weapons. <u>Id.</u> at 15:18-21, 16:8-12, <u>see also</u> <u>Berkemer v. McCarty</u>, 468 U.S. 420, 438 (1984) ("[T]he aura of authority surrounding an armed, uniformed officer . . . exert[s] some pressure on the detainee to respond to questions."). On balance, therefore, Pelice was not in custody because his "freedom of movement was [not] curtailed." <u>Howes</u>, 565 U.S. at 509.

Even if Pelice's freedom of movement were curtailed, he was not in custody under <u>Howes</u> step two. To be sure, Pelice may have wished to speak in the hopes of "more lenient treatment." <u>Id.</u> at 512 (quoting <u>Illinois v. Perkins</u>, 496 U.S. 292, 297 (1990)). But there is no indication of "the shock that very often accompanies arrest." <u>Id.</u> at 511. Pelice's demeanor was calm, smiling, and eager. Hr'g Tr. 18:13-18. And he was not "cut off from his normal life and companions." <u>Howes</u>, 565 U.S. at 511 (quoting <u>Maryland v. Shatzer</u>, 559 U.S. 98, 106 (2010)). Instead, he had his wife with him. Hr'g Tr. 17:5-7. Moreover, there is nothing to suggest that Pelice spoke in the hope of being allowed to leave. <u>Howes</u>, 565 U.S. at 511. Rather, Dugue told him that he could stop at any time. <u>Id.</u> at 17:11-18:3. Accordingly, no <u>Miranda</u> violation occurred at the Santo Domingo interview because Pelice was not in custody.

Although Pelice contended in his motion to suppress that he was also not read his <u>Miranda</u> rights in the United States, Mot. 3, he conceded that point in the suppression hearing after Dugue's uncontradicted testimony that either he or Santamaria orally provided the warnings, Hr'g Tr. 25:5-26:5, 67:15-20. Pelice and his then-attorney also received a proffer letter, which AUSA Seifert explained to them. <u>Id.</u> at 51:18-52:5. The record is unclear on whether Pelice and his attorney signed the proffer letter agreeing that the interview was voluntary, <u>id.</u>, which would constitute

express waiver, <u>Berghuis</u>, 560 U.S. at 383.  Nevertheless, "a suspect who has received and understood the <u>Miranda</u> warnings, and has not invoked his <u>Miranda</u> rights, [impliedly] waives the right to remain silent by making an uncoerced statement to the police."  <u>Id.</u> at 388-89.  Here, the Court has already found that Pelice's July 8 statements were uncoerced, and the uncontradicted evidence is that he received <u>Miranda</u> warnings in Haitian Creole and then had ample opportunity to speak to his then-counsel privately both before and during the interview.  **Thus, the Court finds that Pelice was read his <u>Miranda</u> rights before the July 8 interview and that he waived those rights.**

<u>**Conclusion**</u>

For the foregoing reasons, the Court will deny Pelice's motion to suppress.  A separate order will accompany this opinion.

_____
/s/
JOHN D. BATES
United States District Judge

Date: <u>December 10, 2025</u>